UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| ERNEST GUARDADO, | ) | |
| | ) | Case No.: 2:21-cv-00994-GMN-EJY |
| Plaintiff, | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| JAMES DZURENDA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is Plaintiff Ernest Guardado's ("Plaintiff's") Motion for Preliminary Injunction, (ECF No. 69). Defendants Julio Calderin, Charles Daniels, Monique Hubbard-Pickett, Jennifer Nash, Gary Piccinini, Harold Wickham, Calvin Johnson, and Brian Williams (collectively, "Defendants") filed a Response, (ECF No. 71), to which Plaintiff filed a Reply, (ECF No. 75).

For the reasons discussed below, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction.

**I.     BACKGROUND**

This case arises from Plaintiff's various allegations, pursuant to 42 U.S.C. § 1983, that Defendants violated his First and Fourteenth Amendment rights, as well as the Religious Land Use and Incarcerated Persons Act ("RLUIPA"), while he was incarcerated at High Desert State Prison ("HDSP"). (*See generally* Second Am. Compl. ("SAC"), ECF No. 50). Plaintiff, a member of the Native American faith, claims that Defendants are burdening his right to practice his religion. Specifically, the SAC alleges the following: (1) Plaintiff was not allowed to purchase Native American religious items, such as a sacred pipe, kinnikinnick tobacco, and sacred herbs; (2) Defendants denied Plaintiff the ability to perform Native American

ceremonies, including a weekly, four-hour sacred sweat; (3) Plaintiff, and other Native American practitioners, are not permitted to wear religious head gear, such as bandanas or headbands; (4) the Native American religious group was denied the opportunity to have a Native American study group; (5) Plaintiff has been denied the ability to practice his sincerely held religious belief or perform his sacred sweats, sacred pipe, or smudging; (6) Plaintiff's sincerely held religious beliefs require him to eat natural foods, but Defendants denied his request to be placed on the common fare diet; (7) Defendants have retaliated against Plaintiff for pursuing his legal claims by withholding and destroying legal documents pertaining to this case and Plaintiff's other civil complaints; and (8) Defendants were deliberately indifferent to Plaintiff's religious rights and needs during the grievance process. (*See generally id.*).

The Court has previously ruled on several other Motions for Preliminary Injunction in this case. (*See* Orders, ECF Nos. 7, 52, 87). The instant Motion requests that the Court (1) order Defendants to assign a Native American practitioner ("NAP") as a groundskeeper, (2) permit Plaintiff to perform his sacred sweat ceremony on a weekly basis for four hours, and (3) permit Plaintiff to wear religious headwear, headbands or bandanas, at all times. (Mot. Prelim. Inj. 1:10–18, ECF No. 69).

## II.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, (2008). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).

The Ninth Circuit has held that "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted). Furthermore, under the Prison Litigation Reform Act ("PLRA"), preliminary injunctive relief must be "narrowly drawn," must "extend no further than necessary to correct the harm," and must be "the least intrusive means necessary to correct [the] harm." 18 U.S.C. § 3626(a)(2).

### III.   DISCUSSION

The Court finds that Plaintiff has not established that he is likely to succeed on the merits of his First Amendment, Fourteenth Amendment, and RLUIPA claims pertaining to the instant Motion for Preliminary Injunction.[1]  The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I.  Prisoners retain their First Amendment rights, including the right to free exercise of religion, while they are incarcerated. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  The right to free exercise of religion, however, "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir.1987).

RLUIPA expands rights under the First Amendment's Free Exercise Clause, mandating the following:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person–
> (1) is in furtherance of a compelling governmental interest; and

---

[1] Because the Court DENIES Plaintiff's Motion for failure to show a likelihood of success on the merits, the Court does not address Defendants' other arguments challenging the Motion.

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)-(2).  A prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation. *Holt v. Hobbs*, 574 U.S. 352, 360–61 (2015).

Lastly, under the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  The Equal Protection Clause does not forbid classifications, but rather "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Id.*  In general, state actors "are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961).

### A. Groundskeeper

In its Screening Order, the Court found that Plaintiff's claims based on the alleged desecration of sacred Native American grounds, including Plaintiff's claim regarding the assignment of groundskeepers, are colorable under RLUIPA and the Free Exercise Clause of the First Amendment. (*See* Screening Order 11:18–23; 2:23–13:4, ECF No. 15).  Under RLUIPA, Plaintiff bears the initial burden of presenting evidence to demonstrate a prima facie claim that Defendants' failure to assign an NAP groundskeeper constitutes a substantial burden on the exercise of his religious beliefs. *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).  If Plaintiff "establishes the prima facie existence of such a substantial burden, on which he bears the burden of persuasion," then Defendants "shall bear the burden of persuasion to prove that any substantial burden on [Plaintiff's] exercise of his religious beliefs is *both* 'in furtherance of a compelling governmental interest' *and* the 'least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000cc-1(a); § 2000cc-2(b)

1  (emphasis in original)).

2  According to Nevada Department of Correction's ("NDOC's") Religious Practice Manual, a groundskeeper is a "[f]aith-declared, Earth-based religious practitioner, approved via a classification process, who maintains the Earth-based grounds assigned by the Warden for use by the inmate's religion." (Admin. Reg. 810.3 4(P), Ex. C to Resp., ECF No. 71-3).  HDSP has two groundskeeper positions: one for the protected custody inmate population, and another for the general inmate population. (Decl. Chaplain Calerin ¶ 4, Ex. D to Resp., ECF No. 71-4). Although the groundskeepers maintain the Earth-based grounds, members of each faith group are responsible for repairing their specific religious property on the grounds, such as the inipi or plunge pool. (*Id.* ¶ 6, Ex. D to Resp.).

Plaintiff asserts that permitting a non-NAP to serve as a groundskeeper violates his religious beliefs because "certain rituals, prayers and steps must be done prior to cutting any plant or rebuilding/fixing the inipi, fire pits, prayer circle and drum circle, or for filling or draining the plunge pool." (Mot. Prelim. Inj. 6:17–22). According to Plaintiff, permitting a non-NAP to maintain the grounds desecrates the grounds. (*Id.* 6:22–24). Plaintiff also argues that other non-NAP Earth-based practitioners "constantly wander onto the NAP grounds and pick/cut plants which is desecration." (*Id.* 6:25–27).

The Court does not question Plaintiff's sincerely held religious beliefs. Nonetheless, the Court finds that Plaintiff fails to meet his burden of presenting evidence to demonstrate a prima facie claim that Defendants' failure to assign an NAP groundskeeper constitutes a substantial burden on the exercise of his religious beliefs. The groundskeeper is responsible for general upkeep of the grounds, not the maintenance of religious property specific to a certain faith group. (*See* Admin. Reg. 810.3 12(G)(1), Ex. C to Resp.). Defendants' failure to assign an NAP groundskeeper does not prevent Plaintiff or other NAPs from performing the rituals,

///

prayers, and steps required for maintaining the religious property.[2]  Additionally, Plaintiff fails to show that the assignment of an NAP groundskeeper would or could prevent other Earth-based practitioners to exercise their own religious beliefs in a shared space.

Moreover, even if Plaintiff could demonstrate a prima facie claim under RLUIPA, Defendants have shown that any substantial burden, if it exists, is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. As Defendants note, "[h]aving religion-specific groundskeepers creates safety concerns and thus provides reasonable justification for prohibiting it."[3] (Resp. 9:16–17, ECF No. 71). Groundskeepers cannot prevent others from wandering onto the grounds, and permitting inmates authorized to act as groundskeepers to do so may result in inmate violence. (*Id.* 9:20–23).  Additionally, granting Plaintiff's request for a religion-specific groundskeeper for his religion could necessitate assigning religion-specific groundskeepers for *all* Earth-based faith groups, which would create an unworkable scheduling and oversight problem for the prison. (*See id.* 10:1–7).  Lastly, permitting the group of inmates who are NAPs to choose a groundskeeper would "require HDSP to bypass their entire application process and include inmates in the classification review process," resulting in inmate privacy concerns. (*Id.* 10:13–17).

///

///

---

[2] In his Reply, Plaintiff argues that given the limited time Plaintiff is permitted to perform necessary ceremonies, without an NAP groundskeeper, he must "choose between practicing his religious beliefs or fixing the inipi or draining and cleaning the plunge pool." (Reply at 6, ECF No. 75).  But the groundskeeper is not responsible for maintaining the inipi or plunge pool. (*See* Admin. Reg. 810.3 12(G)(1), Ex. C to Resp.).  Although the Court is sympathetic to Plaintiff's limited time available to practice his religious beliefs, Plaintiff fails to explain how an NAP groundskeeper would remedy his time constraints.

[3] Plaintiff notes that the religious groups do have their own space, and the religious groups have built unofficial borders around their spaces. (Reply at 5).  This further supports Defendants' argument that religion-specific groundskeepers, if permitted to act as guards of the religious spaces, could result in safety concerns.  Defendants have a compelling governmental interest in preventing violence and fighting among inmates, and adding religion-specific groundskeepers could add to the tension apparently already existing between groups.

Because Plaintiff fails to demonstrate a likelihood of success on the merits relating to his request for an NAP to be assigned as a groundskeeper under the more expansive provisions of RLUIPA, the Court further concludes that Plaintiff will be unable to do so under the Free Exercise Clause of the First Amendment. *See Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1355 (D. Ariz. 2017) (observing that RLUIPA's compelling interest test "imposes a much stricter burden on the government than the First Amendment's alternative means test"). Accordingly, the Court DENIES Plaintiff's request for a preliminary injunction relating to the assignment of an NAP as a groundskeeper.

### B. Sweat Ceremony

The Court similarly finds that Plaintiff fails to demonstrate a likelihood of success on the merits on his First Amendment and RLUIPA claims relating to his request for a weekly four-hour sweat ceremony. NAPs are permitted a monthly four-hour sweat lodge ceremony. (HDSP Chapel Schedule, Ex. E to Resp., ECF No. 71-5). By the instant Motion, Plaintiff requests that he and other NAPs be permitted a weekly four-hour sweat ceremony. But Plaintiff does not explain how a monthly sweat ceremony instead of a weekly ceremony substantially burdens the exercise of his religious beliefs. *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Moreover, even if a substantial burden exists, Defendants adequately explain that limiting the sweat ceremony to once a week serves a compelling governmental interest in accommodating all religious groups, and this limitation is the least restrictive means of furthering this interest. (Resp. 11:6–12:14).

Because Plaintiff fails to demonstrate a likelihood of success on the merits relating to his request for a weekly sweat ceremony under the more expansive provisions of RLUIPA, the Court further concludes that Plaintiff will be unable to do so under the Free Exercise Clause of the First Amendment. *See Sprouse*, 346 F. Supp. 3d at 1355. Accordingly, the Court DENIES Plaintiff's request for a preliminary injunction relating to the frequency of sweat ceremonies.

**C. Religious Headwear**

In addition to RLUIPA and the Free Exercise Clause of the First Amendment, the Court has previously found that Plaintiff's claim regarding religious headwear can proceed under the Equal Protection Clause of the Fourteenth Amendment. (*See* Screening Order 9:1–10:25). The Court will first address Plaintiff's request for a preliminary injunction relating to religious headwear under RLUIPA and the Free Exercise Clause before turning to the Equal Protection Clause.

**1. RLUIPA and the Free Exercise Clause**

Plaintiff fails to demonstrate a likelihood of success on his religious head gear claim under RLUIPA and the First Amendment. The Court has already concluded that "it appears that wearing a headband or bandana is a sincerely held belief for Native American practitioners and is rooted in religious belief." (Screening Order 10:9–10). Although the Court finds that Plaintiff may be able to establish that not being permitted to wear a bandana is a substantial burden on his exercise of his religious beliefs, Defendants have shown that this burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.

Plaintiff's Motion seeks to require Defendants to permit Plaintiff to wear a bandana or headband at all times, instead of the current policy of permitting headbands or bandanas during ceremonies only.[4] Defendants raise compelling governmental interests served by preventing inmates from wearing bandanas or headbands at HDSP, such as inmate and officer safety. (Resp. 13:1–28). First, bandanas or headbands can be perceived as gang affiliation, which may result in violence among inmates. (*Id.* 13:5–7). "Accommodating [Plaintiff's] religious rights in his preferred fashion would require close monitoring by guards to prevent the transmission

---

[4] The parties have not distinguished between a bandana or a headband. It appears that a headband, in this case, refers to a bandana folded into a three-inch strip around one's head. (*See* Reply at 13).

of gang messages, and could lead to gang activity that injures other prisoners." *Rojas v. Heimgartner*, 604 F. App'x 692, 694 (10th Cir. 2015) (concluding that prison regulation preventing NAPs from wearing bandanas served legitimate penological interests). Second, bandanas or headbands can disguise identity or conceal injuries. (Resp. 13:10–11). Third, bandanas or headbands may function as a hiding spot for contraband. (*Id.* 13:11–12). Moreover, because Defendants permit Plaintiff to purchase and use a bandana for ceremonial purposes, any burden on Plaintiff by not being permitted to wear a bandana or headband outside of ceremonies is the least restrictive means of furthering the compelling governmental interests of prison safety and security. *See Rojas*, 604 F. App'x at 694. Accordingly, Plaintiff cannot demonstrate a likelihood of success on his claim regarding religious headwear under RLUIPA or the First Amendment.

      **2. Equal Protection Clause**

Plaintiff argues that Defendants permit other religious groups to always wear their religious headwear yet ban NAPs from wearing their headwear outside of ceremonies in violation of the Equal Protection Clause. (Mot. Prelim. Inj. 10:23–11:27). The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all similarly situated persons be treated equally under the law. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). But a court's review of prison policies and actions is tempered by the recognition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). A "prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests" and not an exaggerated response to a particular concern. *Turner v. Safley*, 482 U.S. 78, 89 (1987).

///

As discussed above, Defendants' policy prohibiting inmates from wearing bandanas or headbands outside of religious ceremonies relates to legitimate penological interests. Moreover, Defendants permit NAPs to wear bandanas or headbands during religious ceremonies, demonstrating that the policy is not an exaggerated response. Although Defendants treat NAPs differently than other similarly situated religious groups, "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence."[5] *Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 136 (1977); *see, e.g.*, *Rojas*, 604 F. App'x at 695 (affirming district court's denial of NAP plaintiff's Equal Protection claim regarding wearing bandanas as religious headwear). Accordingly, Plaintiff fails to show a likelihood of success on the merits of his Equal Protection claim, and the Court DENIES Plaintiff's request for a preliminary injunction regarding religious headwear.

### IV. CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Preliminary Injunction, (ECF No. 69), is **DENIED**.

**DATED** this __22__ day of February, 2023.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT

---

[5] Plaintiff argues that other religious headwear, such as a kufi or a yarmulke, present the same safety concerns as a bandana. (Reply at 13). Given the unique concerns about bandanas in prisons, the Court disagrees. *See, e.g.*, *Rojas*, 604 F. App'x at 694–95.